OPINION OF THE COURT
Max Sayah, J.
THE ISSUE — "PLAIN VIEW”
In this suppression motion the court is called upon to restate the often misinterpreted doctrine of "Plain View”. It is apparent from the facts of this case that law enforcement officials continue to have the mistaken impression that so long *645 as evidence is clearly visible from a public area, it is subject to warrantless seizure. The defendant has contended that the warrantless seizure of inculpatory evidence violated her rights under the 4th Amendment; whereas, the People seek to invoke the "Plain View” doctrine to justify the seizure. We hold that under the "Plain View” doctrine, the seizure here fails to pass constitutional muster.
THE FACTS
On October 2, 1986, Sergeant Moses Jones, an officer with considerable experience in the identification of gambling records, while assigned to the Public Morals Division of the police force, entered a storefront location at 3 West 137 Street in New York. The location housed a vestibule entrance with a doorless opening to a second area. Officer Jones, wearing plain clothes, entered this second area in which he observed numerous players writing policy slips. He further observed the defendant in a third area behind a clear plexiglass enclosure accepting money and wagers through an opening in the plexiglass from players located in the so-called players’ area. Gambling slips and money, which are the subject of the defendant’s suppression motion, were clearly visible on the counters in the area behind the plexiglass. It has been conceded by the People that although the players’ area had public access, the area enclosed by the plexiglass and an unlocked door was not open to the public.
Soon after Officer Jones had made his observations, he prepared to place a wager with the defendant. At this point in time, someone yelled "raise up”, indicating that the police were at the front door. The defendant thereupon came from behind the plexiglass enclosure, entered the players’ area and cautioned the players, "be quiet”. A group of police officers, who had arrived on the scene, remained outside the store while Police Officer Steven Nicotra entered the players’ area. Here, he was directed by Officer Jones to arrest the defendant. At this point the defendant was escorted by Officers Jones and Nicotra to the area behind the plexiglass partition where the subject gambling records and money were seized.
DISCUSSION
THE "PLAIN VIEW” DOCTRINE
At the outset it is clear that in order to avoid confusion and *646 the misapplication of the law, the criminal bar should studiously avoid the loose employment of the phrase "plain view” to describe any visual sighting other than the legal concept enunciated by Coolidge v New Hampshire (403 US 443 [1971]). Rather, terms such as "open view”, "clearly visible” and "readily observable” should describe normal ocular events.
In articulating the "Plain View” doctrine, Coolidge recognized that: "in the vast majority of cases, any evidence seized by the police will be in plain view, at least at the moment of seizure. The problem with the 'plain view’ doctrine has been to identify the circumstances in which plain view has legal significance rather than being simply the normal concomitant of any search, legal or illegal.” (Coolidge v New Hampshire, supra, at 465.)
The court in Coolidge (supra) held that the condition precedent for all situations involving the seizure of evidence in "plain view” is the requirement that there has been a justifiable prior valid intrusion. Four suggested examples although not exhaustive were set forth:
(a) a search pursuant to a warrant to search a given area for specified objects during which the search comes across some other article of contraband. (Citing Go-Bart Importing Co. v United States, 282 US 344 [1931]; Steele v United States No. 1, 267 US 498 [1925].)
(b) exigent circumstances during which the police come across evidence, such as "hot pursuit” of a fleeing suspect. (Citing Warden v Hayden, 387 US 294 [1967].)
(c) seizure of an object which comes into view during a search incident to a lawful arrest. (Citing Chimel v California, 395 US 752 [1969].)
(d) the valid presence of a police officer in a constitutionally protected area during which he inadvertently comes across an incriminating object. (Citing Harris v United States, 390 US 234 [1968]; see also, People v Spinelli, 35 NY2d 77, 80.)
Coolidge thus points to the common thread of all "plain view” cases. "[W]hat the 'plain view’ cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence”. (Coolidge v New Hampshire, supra, at 466.)
The second requirement precedent to the use of the "plain view” doctrine is that the discovery of the evidence is inadvertent. Coolidge amplifies this requirement (at 469-471): "The *647 second limitation is that the discovery of evidence in plain view must be inadvertent. The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a 'general’ one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as 'per se unreasonable’ in the absence of 'exigent circumstances.’ ”
It is thus clear that the requirement of inadvertence is aimed at preventing a police entry into a protected area for making an arrest as a mere subterfuge for so-called plain view reconnaissance. One cannot plan "plain view”. There must be a prior valid intrusion plus an inadvertent discovery for the doctrine to take effect.
THE INSTANT CASE
It is clear that based on the observations at the scene, police officers had reasonable cause to arrest the defendant Amy Roberson. (CPL 140.10; People v Moore, 11 NY2d 271 [1962].) Officer Jones had observed the defendant commit crimes in his presence, i.e., promoting gambling in the second degree (Penal Law § 225.05), and possession of gambling records in the second degree (Penal Law § 225.15). When the defendant was arrested by Officer Nicostra in the public area of the gambling enterprise, the officers had the further obligation and right to search the defendant’s person as well as the immediate area within her reach and control for weapons or evidence of the crimes which she could possibly conceal or destroy. (Chimel v California, 395 US 752, supra.) However, "[t]here is no comparable justification”, Chimel held, "for routinely searching any room other than that in which an arrest occurs * * * Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant.” (Chimel v California, supra, at 763, citing Katz v United States, 389 US 347.) By escorting the defendant into the back private area even though all of the evidence was clearly visible, the officers ran afoul of the dictates of Coolidge. Absent clearly articulable exigent circumstances, they entered a constitutionally *648 protected area* in order to seize evidence. There was no one in the room who could destroy evidence. At least three officers were present and available to seal the area pending an application for a warrant. Such application would have readily been approved based on the probable cause observations of Officer Jones. A mere desire on the part of the public morals squad to avoid the onerous chore of obtaining a search warrant was not an excuse for evading the protections afforded by the 4th Amendment. (Chimel v California, supra; Terry v Ohio, 392 US 1; People v Spinelli, 35 NY2d 77, supra.)
CONCLUSION
There is no dispute that as the officers were standing in the players’ area, they were unquestionably in an area open to the public and hence had a right to be there. From that vantage point, the officers could observe anything that could be seen. Clearly, the gambling slips and money were "clearly visible” to the officers and in effect were in "open view”, were "readily observable”, were "open to public scrutiny” — to use the proper ocular terms. But as we have indicated, simply seeing evidence in "open view” from a legitimate viewing point does not warrant the ultimate seizability under the "Plain View” doctrine. The defendant’s constitutionally protected area, her legitimate boundary of the expectation of privacy, was the back room behind the plexiglass. Thus under the Coolidge, Spinelli requirements, the police had a right to enter the public area but could not cross into the private area without a warrant. In effect, the police were on the outside, peeking in. There being no prior valid intrusion into the nonpublic area, the "Plain View” doctrine was not applicable to this case. This was a fixed premises and no amount of probable cause absent exigent circumstances justified the intrusion into the back area by the police. (Coolidge v New Hampshire, supra, at 468; Taylor v United States, 286 US 1 [1932]; People v Spinelli, supra; but see, People v Jackson, 41 NY2d 146 [1976] [exigent circumstances].)
The evidence taken by the officers from behind the plexiglass enclosure is thus suppressed as unconstitutionally seized.

 It is well settled that a businessman’s private commercial property is entitled to 4th Amendment protections. (People v Spinelli, 35 NY2d 77, 80, citing See v City of Seattle, 387 US 541.)